UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DELIA WEST,

          Plaintiff,

v.                       Case No.  8:08-cv-1325-T-33MAP

VERIZON SERVICES CORP., VERIZON
FLORIDA, LLC, and PDS TECHNICAL
SERVICES, INC.,

          Defendants.
_____/

**ORDER**

This cause is before the Court pursuant to PDS Technical Services, Inc.'s Motion for Partial Summary Judgment (Doc. # 214) and Verizon Services Corp. and Verizon Florida LLC's Motion for Summary Judgment (Doc. # 215), both filed on November 1, 2010. Delia West filed a response to each motion on November 29, 2010. (Doc. # 223, 224). For the reasons that follow, the Court denies the motions for summary judgment in this Fair Labor Standards Act case.

**I.   Factual Background**

    **A.   The Personal Account Manager Program**

In December 2007, Verizon developed a customer service improvement plan that involved the creation of the Personal Account Manager position. (Cutcher Decl. Doc. # 216 at ¶ 2). Personal Account Managers were issued a Blackberry phone and assigned a certain number of Verizon customers. (Id. at ¶ 4). Personal Account Managers were instructed to call 30 of their

customers per day to introduce themselves until each customer on the list had been reached. (Id. at ¶ 8).   During this initial customer introduction period, Personal Account Managers were also required to answer incoming customer calls from 9:00 a.m. until 9:00 p.m. Monday through Saturday. (Id.)

After a Personal Account Manager reached all of the customers on their list, Personal Account Managers were responsible for answering customer calls between 9:00 a.m. until 9:00 p.m. Monday through Saturday, live "without fail." (Doc. # 218-1 at 35).   The Personal Account Manager "Requirement Agreement" explained that "90% of inbound calls must be answered live, (voicemail does not count)." (Id.)  In addition, Personal Account Managers were required to follow up with their customers to ensure that any account issues identified were resolved satisfactorily by Verizon. (Cutcher Decl. Doc. # 216 at ¶ 4, 7).   Personal Account Managers also sold Verizon products to the customers and received commissions for each sale. (Doc. # 218-1 at 35).   Personal Account Managers were also required to make a notation on a website maintained by Verizon about each call to document interaction with Verizon's customers. (Cutcher Decl. Doc. # 216 at ¶ 10).

Verizon contracted with PDS, a staffing company, to recruit Personal Account Managers. (Id. at ¶ 6).   David

Cutcher, a Verizon Florida LLC Business Development Manager, filed a declaration indicating that all Personal Account Managers were employees of PDS, and were not Verizon employees. (Id.) The Service Agreement between Verizon and PDS regarding the Personal Account Managers states in pertinent part:

> Persons furnished by [PDS] shall be solely the employees or agents of [PDS] and shall be under the sole and exclusive direction and control of such Party. They shall not be considered employees of Verizon for any purpose. [PDS] shall be responsible for compliance with all laws, rules and regulations involving its respective employees or agents, (including but not limited to) employment of labor, hours of labor, health and safety, working conditions and payment of wages. [PDS] shall also be responsible, respectively, for payment of taxes, including federal, state, and municipal taxes, chargeable or assessed with respect to its employees or agents, such as social security, unemployment, worker's compensation, disability insurance and federal and state income tax withholding.

(Doc. # 217-1 at 23, ¶ 25)(emphasis added).

In connection with the Personal Account Manager program, PDS recruited Personal Account Managers and their supervisors, ran background checks on them, hired them, paid their salaries, and provided benefits to them. (Cutcher Decl. Doc. # 216 at ¶ 6). PDS paid each Personal Account Manager a base salary of $400 per week, and Personal Account Managers were eligible to receive further compensation in the form of sales commissions and weekly $200 bonuses based on customer

-3-

satisfaction scores. (Cutcher Dep. Doc. # 218-1 at 52). According to Cutcher, "Verizon did not have the power to, nor did it, terminate the [Personal Account Managers] or [Personal Account Manager] supervisors." (Cutcher Decl. Doc. # 216 at ¶ 6).

However, Woody Jackson, a Verizon employee formerly in charge of the Personal Account Manager Program, testified that when ever he felt a Personal Account Manager "was not acceptable for the program" because such Personal Account Manager "did not take care of the customer" or did not answer incoming calls, he notified PDS, and the unsatisfactory Personal Account Manager would be terminated. (Jackson Dep. Doc. # 229 at 39-41). Jackson testified that he effected the termination of at least fifty Personal Account Managers by contacting PDS. (Id. at 40:1-13).

Personal Account Managers could perform their duties from any location convenient to them as long as they had their Blackberry phone on hand, and many chose to work from home. (Cutcher Decl. Doc. # 216 at ¶ 13). The only time that Personal Account Managers were required to work from a Verizon location was during their initial training sessions and during weekly meetings held with their supervisors. (Id. at ¶ 7, 12).

Based upon these requirements, Verizon "believed" that Personal Account Managers would work less than 40 hours per

week. (Id. at ¶ 15).  In May 2008, Verizon completed a survey of the Personal Account Managers and among other things, asked how many hours per week the Personal Account Managers were working.  (Id. at ¶ 16-17).  One third of the Personal Account Managers reported working over 40 hours a week; however, on average, the Personal Account Managers reported working approximately 36.5 hours per week. (Id.)

**B.   West is Hired as a Personal Account Manager**

In May 2008, PDS contacted West in response to her resume, which was posted online. (West Dep. Doc. # 225 at 66).[1]  PDS asked West to complete an employment application, and PDS performed a background test on West. (Id. at 69-70, 91; Laulo Dep. Doc. # 227 at 132-133).  PDS hired West as a Personal Account Manager and provided West with a "non-employee" badge so that West could gain access to Verizon's facility for training purposes. (Laulo Dep. Doc. # 227 at 136; West Dep. Doc. # 225 at 155).  West served as a Personal Account Manager from May 19, 2008, through October 3, 2008. (Doc. # 165).[2]  West testified that she was assigned over

---

[1] West was deposed twice in this case.  Her first deposition, which occurred on July 8, 2010, is referred to herein as "West Dep. Doc. # 225."  Her second deposition, which occurred on September 28, 2010, is referred to herein as "West Dep. Doc. # 218-5."

[2] In September 2008, Verizon informed PDS that it decided
(continued...)

1,000 customers. (West Dep. Doc. # 225 at 127).  She further testified that her duties including answering incoming customer calls, making outbound calls, calling technical support and the billing department for customers, reading and responding to emails (from Verizon clients and from Verizon employees), upgrading and selling Verizon products, and logging everything on the Verizon website. (Id. at 111-112). She also attended Personal Account Manager meetings that sometimes lasted over two hours. (Id. at 115-117).

In addition, West indicated that she went "over and above" the call of duty by taking handwritten notes throughout the day and by making a visit to a Verizon customer's home. (Id. at 101, 126-127, 131).

Neither Verizon nor PDS required Personal Account Managers to keep track of their time, and, likewise, neither Verizon nor PDS tracked West's hours worked. (Cutcher Dep. Doc. # 218-1 at 47, 88-89; Jackson Dep. Doc. 229 at 49-50).

West did not keep time sheets, but she submits that she did not need to keep any time records because she worked 72 hours a week, every week, without variation in her schedule. (West Dep. Doc. # 218-5 at 195).  West testified that she was

---

<sup>2</sup>(...continued)
to terminate the Personal Account Manager program. (Cutcher Decl. Doc. # 216 at ¶ 19-20).

"pretty busy" every day and does not believe that there were long periods in the day in which there was not work for her to complete. (West Dep. Doc. # 218-5 at 193).  West also remarked that the Verizon website was extremely slow, so it took her a particularly long time to log her calls even though she was a quick typist. (West Dep. Doc. # 225 at 112).  Regarding some of her duties and the pace of her work, West testified:

> I sat on hold for four hours at a time waiting. And I'd tell them – we had to tell them that we would call them back when we got ahold of the other department.  We had to let the customer go and call them back.   You get incoming e-mails from customers, because they could e-mail you also on the Web mail, not the – and it didn't always transfer to the Blackberry because the service had its little quirks sometimes.  So I was – between 9 and 9, if I wasn't making phone calls, I was pretty much trapped at my computer.  There were times I didn't even get to go to the bathroom during the day because I would have those incoming e-mails. And not only would it be customers, but the supervisor - Woody [Jackson], Dave Cutcher - would send out stuff.  So the time we weren't making phone calls, we were reading those, and a lot of times, there were policy changes during the middle of the day.  We also had to try to upgrade or sell Verizon customers: put them in a bundle; get them to try to buy extra services, movie channels, phone service, whatever it may be.  Whatever they didn't have we were supposed to try to sell to them. Doing the noting, you had to log everything.  And anytime that we needed to talk to the billing department, we couldn't e-mail them through the Web mail.  We had to notify them through the PAM Web site, which was extremely slow.  I mean, you could type a line and sit there for a minute, type a line and sit there for a minute.  And you had to code it – you had to enter your note and then – then you had to make a separate note to send to billing to let them know what was going on so they could

>           correct it. I know that we had to do a lot of
>           follow-up with billing, follow up with customers.

(<u>Id.</u> at 111-113).  She also testified that "my phone started

ringing at 7:00 in the morning and many times it didn't stop

ringing until after midnight." (<u>Id.</u> at 169).

Verizon filed West's Blackberry phone records.[3]  Her

phone calls to and from customers never exceeded 40 hours per

week, in fact, the most West ever spent on the phone during

any week as a Personal Account Manager was 14.3 hours, and

that week was August 24 - August 30, 2008. (Wargo Decl. Doc.

# 218 at 3-7).  During most weeks, West had under 12 hours of

phone time, and in one week, she had only .8 hours of phone

time (the week of July 27 - August 2, 2008).

## II.  __Procedural History__

West filed this case against Version and PDS on July 10,

2008, and filed a single count amended complaint, with leave

of Court, on June 4, 2010. (Doc. # 1, 189).  Therein, West

claims that she worked for 72 hours a week and was not paid

overtime compensation in violation of the Fair Labor Standards

Act, 29 U.S.C. § 207.  She seeks $9,600 in overtime

---

[3] West testified that she communicated with Verizon
customers using her Blackberry phone, and she did not use her
Blackberry phone for any other purpose.  (West Dep. Doc. # 225
at 108; West Dep. Doc. # 218-5 at 226).

compensation as well as liquidated damages and attorney's fees and costs.

Prior to filing the amended complaint, West sought conditional certification of this case as a collective action. (Doc. # 38). On July 29, 2009, the Honorable Mark A. Pizzo, United States Magistrate Judge, issued a Report and Recommendation (Doc. # 156), recommending that West's class certification motion be denied.  PDS and West Objected to the Report and Recommendation. (Doc. # 157, 158).   The Court adopted the Report and Recommendation to the extent that it recommended that class certification be denied. (Doc. # 163).

Thereafter, on October 27, 2009, the Court entered its FLSA Scheduling Order, which required West to file answers to the Court's interrogatories and required Defendants to file a verified summary of West's hours worked and the amount that West was paid. (Doc. # 164).  In her answers to the Court's interrogatories, as to overtime hours worked, West indicated that she "worked 40 regular hours weekly" and "worked 32 hours overtime weekly." (Doc. # 165 at 2, answer 6).  As to her duties as a Personal Account Manager, West indicated that she was responsible for the following:

> Taking incoming calls 72 hours per week.
> Research and resolve billing issues.
> Explain products and services.
> Troubleshoot service equipment issues.

> Handling a high volume of inbound customer service calls.
> Evaluate customer concerns and resolve problems to the customer's satisfaction.
> Working independently with minimal supervision.
> Creating spreadsheets in Excel, and PowerPoint presentations.

(Doc. # 165 at 2, answer 4).

After West responded to the Court's interrogatories, Verizon and PDS filed individual verified summaries of West's wages and hours worked. (Doc. # 169, 170). PDS did not comment on West's hours worked. (Doc. # 169). Rather, PDS provided a chart showing the amount it paid West each week. During seven of the weeks of her employment, West received only her base salary of $400. (Id.) In the other weeks, she received a greater amount due to commission payments and customer satisfaction bonus payments, with the highest paid week being the week beginning June 15, 2008, in which she received $710. (Id.)

Verizon, in its verified summary of hours worked by West, filed two items purporting to capture most, if not all, of the hours of work performed by West. Specifically, Verizon filed: (1) a list of every call (incoming and outgoing) made on West's Blackberry phone (including the length of each call); and (2) a list of each call log entry West made on the Verizon website (including how many words the call log entry consisted

of).[4]  Defendants submit that these documents, while not "time sheets" are a reasonably comparable substitute for official time sheets.[5]

Verizon's records tend to show that West spent the following amount of time on her Blackberry phone during each week below in 2008:

| | |
|---|---|
| 5/19 – 5/24: | **8.8 hours** |
| 5/25 – 5/31: | **12.6 hours** |
| 6/1 – 6/7: | **7.8 hours** |
| 6/8 – 6/14: | **12.9 hours** |
| 6/15 – 6/21: | **11.0 hours** |
| 6/22 – 6/28: | **9.2 hours** |
| 6/29 – 7/5: | **6.8 hours** |
| 7/6 – 7/12: | **12.5 hours** |
| 7/13 – 7/19: | **3.2 hours** |
| 7/20 – 7/26: | **2.0 hours** |
| 7/27 – 8/2: | **0.8 hours** |
| 8/3 – 8/9: | **6.8 hours** |
| 8/10 – 8/16: | **2.9 hours** |
| 8/17 – 8/23: | **3.1 hours** |
| 8/24 – 8/30: | **14.3 hours** |
| 8/31 – 9/6: | **1.7 hours** |
| 9/7 – 9/13: | **3.2 hours** |
| 9/14 – 9/20: | **2.0 hours** |
| 9/21 – 9/27: | **1.1 hours** |
| 9/28 – 10/3: | **2.4 hours** |

(Doc. # 170 at 2-5; Doc. 218).

Verizon also submitted a chart showing how many call log entries West made on Verizon's website to document her client

---

[4] Later in the case, in conjunction with summary judgment proceedings, Defendants filed an updated version of this information. (Doc. # 218).

[5] West disputes the accuracy of these reports.

calls.  Because each call log entry was made online, Verizon submits that it is able to calculate, to a certain degree of accuracy, how much time West spent making each such call log entry.  Verizon submitted two versions of this information, one using a words per minute typing rate of 35 words per minute (Doc. # 218), and one using 11 words per minute (Doc. # 170).

According to Verizon's chart based on West typing 11 words per minute, West spent the following amount of time each week making call log entries on Verizon's Personal Account Manager Website:

| | |
|---|---|
| 5/19 – 5/24: | **4.5 hours (words typed: 2966)** |
| 5/25 – 5/31: | **8.5 hours (words typed: 5599)** |
| 6/1 – 6/7: | **5.4 hours (words typed: 3574)** |
| 6/8 – 6/14: | **8.6 hours (words typed: 5695)** |
| 6/15 – 6/21: | **9.2 hours (words typed: 6073)** |
| 6/22 – 6/28: | **6.7 hours (words typed: 4452)** |
| 6/29 – 7/5: | **4.9 hours (words typed: 3245)** |
| 7/6 – 7/12: | **3.0 hours (words typed: 1950)** |
| 7/13 – 7/19: | **1.6 hours (words typed: 1057)** |
| 7/20 – 7/26: | **1.4 hours (words typed: 908)** |
| 7/27 – 8/2: | **0.4 hours (words typed: 270)** |
| 8/3 – 8/9: | **1.3 hours (words typed: 856)** |
| 8/10 – 8/16: | **1.4 hours (words typed: 915)** |
| 8/17 – 8/23: | **1.1 hours (words typed: 715)** |
| 8/24 – 8/30: | **0.7 hours (words typed: 483)** |
| 8/31 – 9/2: | **0.3 hours (words typed: 216)**[6] |

(Doc. # 170 at 6-10).

---

[6] Verizon's Verified Summary of Hours worked (Doc. # 170) does not include data for any week after September 2, 2008.

The parties fully complied with the terms of the Court's FLSA Scheduling Order, including the requirement of holding settlement conferences.   After the parties exhausted all settlement efforts, the parties filed a Case Management Report. (Doc. # 174, 175).  The Court thereafter issued a Case Management and Scheduling Order with a dispositive motions deadline of November 1, 2010 (Doc. # 176).

On November 1, 2010, both PDS and Verizon filed motions for summary judgment. (Doc. # 214, 215). Verizon seeks an order of summary judgment based on the argument that Verizon is not West's employer for FLSA purposes, and therefore, cannot be held responsible for any FLSA violation.   PDS, on the other hand, seeks an order of summary judgment based on the argument that West never worked overtime hours.

In addition, PDS submits that if West did work overtime, PDS cannot be held responsible because West never informed PDS of overtime hours worked.   Furthermore, in the event that overtime premiums are found to be due to West, PDS argues that West is not entitled to overtime compensation at the rate of time and one-half.   The Court will address these arguments, and others, below.

## III. __FLSA Requirements__

Under the FLSA, an employer may not employ an employee for a workweek longer than 40 hours unless such employee receives overtime compensation at a rate of at least one and one half times the employee's regular rate of pay.  29 U.S.C. § 207(a)(1).  "A person is employed if he or she is suffered or permitted to work." Allen v. Bd. of Pub. Educ., 495 F.3d 1306, 1314 (11th Cir. 2007)(citing 29 U.S.C. § 203(g)).  "It is not relevant that the employer did not ask the employee to do the work.  The reason that the employee performed the work is also not relevant." Allen, 495 F.3d at 1314.  "[I]f the employer knows or has reason to believe that the employee continues to work, the additional hours must be counted." Reich v. Dep't of Conversation and Natural Res., 28 F.3d 1076, 1082 (11th Cir. 1994).

In order to prevail in this case, West must prove that she: (1) worked overtime hours without compensation; and (2) her employer knew or should have known of the overtime work. Allen, 495 F.3d at 1314-1315.

## IV. __Summary Judgment Standard__

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is

no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable fact-finder could return a verdict for the nonmoving party.  <u>Mize v. Jefferson City Bd. of Educ.</u>, 93 F.3d 739, 742 (11th Cir. 1996) (citing <u>Hairston v. Gainesville Sun Publ'g Co.</u>, 9 F.3d 913, 918 (11th Cir. 1993)).  A fact is material if it may affect the outcome of the suit under the governing law.  <u>Allen v. Tyson Foods, Inc.</u>, 121 F.3d 642, 646 (11th Cir. 1997).  The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial.  <u>Hickson Corp. v. N. Crossarm Co.</u>, 357 F.3d 1256, 1260 (11th Cir. 2004) (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986)).  "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a

genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (citing Celotex, 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be drawn in the non-moving party's favor. Shotz v. City of Plantation, Fla., 344 F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the court should not grant summary judgment. Samples ex rel. Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988) (citing Augusta Iron & Steel Works, Inc. v. Employers Ins. of Wausau, 835 F.2d 855, 856 (11th Cir. 1988)). However, if the non-movant's response consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only proper, but required. Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981).

**V.   Analysis**

**A.   Who was West's Employer?**

Verizon claims that PDS was West's employer. PDS does not dispute that it was West's employer. However, West

appears to argue that the Defendants jointly employed her.  "A Plaintiff may seek to sue an individual employer or multiple employers in a FLSA case.  The FLSA contemplates there being several simultaneous employers who may be responsible for compliance with the FLSA."  Kendrick v. Eagle Int'l Group, LLC, Case No. 08-80909-CIV-Marra/Johnson, 2010 U.S. Dist. LEXIS 29248, at *8 (S.D. Fla. Mar. 26, 2010)(citing Falk v. Brennan, 414 U.S. 190, 195 (1973)).

The FLSA defines an "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d).  In deciding whether PDS, Verizon, or both may be correctly classified as West's employer under the FLSA, the Court will examine the "economic realities test."  This concept was discussed by the Court in the FLSA case of Goldberg v. Whitaker House Cooperative, Inc., 366 U.S. 28, 33 (1961)(finding individuals that worked from their homes to be employees under the definition of "employee" under the FLSA).

The Court determines that it is logical to use the same test to examine whether an entity is an employer for the purposes of the FLSA.  The economic realities test includes inquires into: "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled

employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." Villarreal v. Woodman, 113 F.3d 202, 205 (11th Cir. 1997).

The Court determines that a jury must assess the economic realities of West's employment to determine the identity of her employer under the FLSA. See Olivas v. A Little Havana Check Cash, 324 F. App'x 839, 846 (11th Cir. 2009)(reversing a district court's decision that an individual was not an employer under the FLSA and remanding with an instruction that the issue be submitted to a jury: "Contrary to the court's conclusion, we find that reasonable people could conclude that [the individual] was an 'employer')."

A reasonable jury could conclude that either Verizon, PDS, or both acting jointly acted as West's employer. Verizon created the Personal Account Manager concept, and contracted with PDS to hire individual Personal Account Managers. After Personal Account Managers were hired by PDS, they traveled to a Verizon facility for training. Verizon employees, David Cutcher and Woody Jackson, among others, oversaw the Personal Account Manager program and designed the Personal Account Manager work schedule of 9 a.m. to 9 p.m. Monday through Saturday.

Verizon also determined that Personal Account Managers could work from home or any other location with their Blackberry phones. Verizon set the Personal Account Managers' salary at $400 per week, with the opportunity to earn bonus payments and commissions. PDS performed the duty of paying the Personal Account Managers. In addition, PDS maintained the employment records for Personal Account Managers.

If Verizon was not satisfied with any Personal Account Manager's performance, Verizon effected such Personal Account Manager's termination simply by asking PDS to terminate such Personal Account Manager. PDS did not fire any Personal Account Manager on its own. PDS only terminated individuals that Verizon directed PDS to terminate.

In addition, a contract existed between PDS and Verizon defining PDS as the "employer" for FLSA purposes and specifically indicating that Verizon is not the "employer." However, this contract is not dispositive. In determining an employment relationship, "all of the incidents of the relationship must be assessed and weighed with no one factor being decisive." NLRB v. United Ins. Co., 390 U.S. 254, 258 (1968). The contract is one factor, among many, that the jury should consider in determining the identity of West's employer

under the expansive definition of "employer" set forth in the FLSA.

**B.   <u>Did West Work Overtime Hours?</u>**

Verizon and PDS have filed copious documents in an effort to show that West did not work hours in excess of 40 per week. For instance, Verizon's records of West's Blackberry phone show that her calls never exceeded 40 hours per week.  It appears that in one week of her employment, West spent less than one hour on her Blackberry phone.  Furthermore, Verizon's records of West's call log entries demonstrate that such entries are not lengthy. (Doc. # 216-2).  However, the Court cannot grant summary judgment as to the number of hours that West worked per week.  This is because neither Verizon nor PDS kept track of West's hours worked.  They required her to be available to answer customer calls from 9:00 a.m. to 9:00 p.m. six days per week.

West testified that she worked for the full 72 hours each week and that she was always busy.  Notably, she testified that in addition to time spent on her Blackberry phone and time spent logging calls on the Verizon website, she also performed many other time-consuming tasks.  These tasks included but are not limited to taking handwritten notes, reading e-mails from customers and her supervisors, responding

to her e-mails, attending two-hour-long meetings, and reviewing policy changes. Such tasks are not captured in Defendants' verified summaries and charts, nor could they be because West's hours were not monitored. In sum, Defendants' evidence regarding the time West spent on her phone and on Verizon's website does not paint a full picture of West's hours worked.

West's theory that she worked 72 hours per day, six days a week survives Defendants' motions for summary judgment because West is the non-movant and Defendants are not in possession of evidence that refutes her testimony.[7] Genuine issues of material fact abound as to whether West worked the overtime hours that she claims to have worked. To find that West did not work the hours that she claims to have worked, as urged by Defendants, would constitute an improper credibility determination on a record containing disputed facts. A jury, rather than the Court, must evaluate the evidence presented by

---

[7] Verizon contends that West's time spent between performing her duties is not compensable: "Time spent simply carrying a Blackberry is not compensable." (Doc. # 214 at 6). However, West does not claim that there was time when she "simply carried" her Blackberry phone in anticipation of customer calls. Rather, West testified that she was actively working from 9:00 a.m. to 9:00 p.m. six days a week.

each party and make a credibility determination as to whether West worked overtime hours.

### C. __Did Defendants have Constructive Knowledge of Overtime Hours Worked?__

Defendants assert that West cannot prevail in this action, even assuming that she did work overtime hours, because there is no evidence on file that they, as her employers, knew or had reason to know that she worked overtime hours.  It is not disputed that West informed neither PDS nor Verizon of her purported overtime hours.  Therefore, the inquiry becomes whether Defendants should have known of the purported overtime hours.  That is, whether they had constructive knowledge of West's purported overtime hours.

"An employer is said to have constructive knowledge of its employee's overtime work when it has reason to believe that its employee is working beyond his shift." Allen, 495 F.3d at 1319 (citing 29 C.F.R. ¶ 785.11).  As explained in Gulf King Shrimp Co. v. Wirtz, 407 F.2d 508, 512 (5th Cir. 1969), the employer's knowledge "is measured in accordance with his duty to inquire into the conditions prevailing in his business." (internal citations omitted).[8]

---

[8] Decisions of the former Fifth Circuit issued before
(continued...)

-22-

In <u>Allen</u>, the Eleventh Circuit reversed a district court's grant of summary judgment in a FLSA case in favor of the employer, the school board, even though certain employees, such as para-professionals and secretaries, did not report the overtime hours in question. The district court determined that because the employees did not report the overtime work on their time sheets, summary judgement in favor of the school board was required. The Eleventh Circuit disagreed, noting:

> Some Plaintiffs did not inform their supervisors of their overtime work, but an issue of fact nonetheless remains as to whether the Board should be charged with constructive knowledge as to them. Our cases indicate that an employer can be charged with constructive knowledge even when an employee has not alleged a supervisor's direct knowledge. We have said that if an employer had an opportunity to acquire knowledge of an employee's work by using reasonable diligence, then the employer can be charged with constructive knowledge. An employer is not excused merely because his business requires him to rely on subordinates and personal supervision is not possible. The cases must be rare where prohibited work can be done and knowledge or the consequences of knowledge can be avoided.

<u>Allen</u>, 495 F.3d at 1321 (internal citations omitted).

In this case, it is undisputed that Defendants did not monitor the hours worked by Personal Account Managers, such as

---

[8](...continued)
October 1, 1981, are binding precedent in the Eleventh Circuit. <u>Bonner v. City of Prichard</u>, 661 F.2d 1206, 1209 (11th Cir. 1981).

West.  Jackson, a Verizon executive charged with supervising the Personal Account Manager program, testified that he did not know how many hours the Personal Account Managers and Personal Account Manager Supervisors were working. (Jackson Dep. Doc. # 229 at 92). Incidentally, Jackson testified that while he was supervising the Personal Account Manager program, he worked 22 hours per day. (Id. at 91).

Under the FLSA, Defendants had a duty to look into overtime issues.  Defendants established the Personal Account Managers' work schedules as 9:00 a.m. to 9:00 p.m. six days a week, and did not require Personal Account Managers to engage in any sort of time keeping system.  As stated in Brock v. Norman's Country Market, Inc., 835 F.2d 823, 828 (11th Cir. 1988), "It is firmly established where an employer has not kept adequate records of their employee's wages and hours as required by the FLSA, the employees will not be denied a recovery of back wages on the ground that their uncompensated work cannot be precisely determined.")

In addition, Verizon's internal survey regarding the Personal Account Manager Program revealed that 62 of the Personal Account Managers, which constitutes at least one third of the Personal Account Managers, reported working hours in excess of 40 per week.  Although Verizon stresses that

-24-

"less than half" of the Personal Account Managers reported working overtime, this is not the relevant inquiry for constructive knowledge.  As noted by West, "The fact is Verizon was on notice that a good amount of the PAMs reported working more than 40 hours each week." (Doc. # 223 at 14).

Genuine issues of material fact preclude summary judgment on the issue of whether Defendants knew, or should have known, of West's purported overtime work.  As stated in <u>Allen</u>, "the relevant inquiry" of whether constructive knowledge applies "is a highly factual one that only a jury is equipped to undertake." 495 F.3d at 1322.  A jury, rather than this Court, must determine whether Defendants knew, or should have known, of West's purported overtime work.

### D.  <u>Rate of Overtime Compensation</u>

As noted above, Defendants argue that West is not entitled to any overtime compensation.  However, in the alternative to Defendants' aforementioned arguments, Defendants submit that if West is entitled to overtime compensation, she is not entitled to overtime compensation at the rate of time and one-half for hours worked over 40.  Rather, Defendants contend that, if West is entitled to overtime compensation, her damages should be calculated using

the "half-time" method.  West disagrees, and seeks time and one-half for all overtime hours worked.

The FLSA mandates overtime payment for non-exempt employees for hours worked over 40 in a workweek at a rate of one and one-half times the regular rate at which the employee is paid.  29 U.S.C. § 207(a)(1).  As correctly noted by Defendants, "calculation of the 'regular rate' is thus the starting point for determining the amount of overtime an employee is owed." (Doc. # 214 at 12).

In Overnight Motor Transportation Company v. Missel, 316 U.S. 572, 580 (1942), the Court held that the employee's "regular rate" may be determined by dividing the number of hours actually worked by the weekly wage. Id.  As a result, a non-exempt employee who receives a weekly salary for all hours worked (even hours over 40) has, by definition, already been paid his "regular rate" for all hours worked in the workweek. Using this method, a salaried employee is only owed half-time for any hours worked in excess of 40 per week.

There can be no doubt that under certain circumstances, overtime payment using the half-time approach is entirely appropriate.  "Virtually every court that has considered the question has upheld the remedial use of half-time in failed exemption cases." Torres v. Bacardi Global Brands Promotions,

Inc., 482 F. Supp. 2d 1379, 1381, n. 2 (S.D. Fla. 2007)(internal citation omitted). However, West asserts that compensation for overtime using the half-time approach, rather than the time and one-half approach, is improper here because Defendants have not satisfied the requirements of the "Fluctuating Work Week" Regulation.

Under 29 C.F.R. § 778.114, the fluctuating workweek method of calculating compensation is used only if the following requirements are met: (1) the employee's hours fluctuate from week to week; (2) the employee receives a fixed weekly salary which remains the same regardless of the number of hours worked during the week; (3) the fixed amount is sufficient to provide compensation at a regular rate not less than the legal minimum wage; (4) the employer and the employee have a clear and mutual understanding that the employer will pay the employee a fixed salary regardless of the number of hours worked; and (5) the employee receives a fifty percent overtime premium in addition to the fixed weekly salary for all hours worked in excess of 40 during the week.[9] See also Davis v. Friendly Express, Inc., 61 Fed. App'x 671 (11th Cir. 2003); O'Brien v. Town of Agawam, 350 F.3d 279, 288 (1st Cir.

_____

[9] Defendants have not presented argument concerning whether the fluctuating work week factors have been met.

2003); <u>Griffin v. Wake County</u>, 142 F.3d 712, 716 (4th Cir. 1998).

It is evident that the arrangement between West and Defendants does not comport with the fluctuating workweek requirements above. Most importantly, if West worked 72 hours a week, her hourly rate using the fluctuating workweek method would be $5.56, which is less than the applicable minimum wage during the time of her employment ($6.79). As calculated by West, "any week in which West worked at least 59 hours, her hourly rate would fall below the guaranteed minimum wage." (Doc. # 224).

In addition, West testified that her hours did not fluctuate in that she worked 72 hours per week, every week. There can be no understanding that an employee's salary is intended to compensate for fluctuating hours –– the hallmark of a fluctuating work week case –– when the worker understands her hours to be set at 72 hours per week. Furthermore, West's salary was not "fixed" because she received various bonus payments and commissions.

On the present record, the Court declines to determine that West's overtime compensation, if any, should be limited to half-time, rather than time and one-half. In the instance that a jury determines that West is entitled to overtime

compensation, West's rate of overtime compensation will be time and one-half.

Accordingly, it is hereby

**ORDERED, ADJUDGED,** and **DECREED:**

PDS Technical Services, Inc.'s Motion for Partial Summary Judgment (Doc. # 214) and Verizon Services Corp. and Verizon Florida LLC's Motion for Summary Judgment (Doc. # 215) are **DENIED**.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this <u>21st</u> day of January 2011.

_____
VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

Copies:  All Counsel of Record